356

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

2022 OCT 26 PM 1:25

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

16 HALLWOOD AVENUE,
DAYTON, OHIO 45417

)
)
)
)
)
)

Case No.

3:22 mj 356

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southen_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Eric McIntosh, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Telephone _____ *(specify reliable electronic means)*.

Date: 10/26/22

*Judge's signature*

City and state: Dayton, Ohio

Hon. Peter B. Silvain, Jr., U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

*Property to Be Searched*

The property to be searched is 16 Hallwood Avenue, Dayton, Ohio 45417 (**TARGET RESIDENCE**), pictured below, and further described as a single-family residence with white siding, blue shutters, and grey roof shingles. An address number of "16" in black numbers is affixed to the house to the right of the front covered porch. The front door has a white-trimmed storm door. The property to be searched also includes the tan 2013 Nissan Altima bearing Ohio license plate number JTZ6052, pictured below, and any vehicles located on the premises or on the curtilage of the premises during the execution of the search warrant.







## ATTACHMENT B

*Items to be Seized*

All items and records relating to violations of Title 21 U.S.C. §§ 841 and 846, those violations involving Dlaquan CANTRELL and occurring in or after September 1, 2022, including:

    a. Any and all controlled substances (as defined under Title 21, United States Code, § 812), including, but not limited to, methamphetamine, cocaine, and fentanyl;

    b. Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

    c. Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports

(such as shipper's export declarations, bills of lading, invoices, tax

identification number paperwork, and other similar documents).

d. Currency (whether U.S. or foreign) and financial instruments, including

travelers checks, bonds, stock certificates, cashier's checks, certificates of

deposit, and money orders, derived from the sale of controlled substances in

violation of Title 21, United States Code, § 841 and money wrappers, rubber

bands, money containers, and money counting machines.

e. Precious metals, jewelry or other high-value items that could be obtained with

the proceeds of the sales of controlled substances.

f. Any and all records, documents and deeds reflecting the purchase or lease of

real estate, vehicles, precious metals, jewelry or other high-value items that

could be obtained with the proceeds of the sales of controlled substances.

g. Any boxes, bags, briefcases, suitcases, containers, or other items that could be

used to mail, carry, import, export, smuggle, or transport marijuana or any

other controlled substances.

h. Photographs (both paper and digital form) and video and audio recordings

which document an association with other co-conspirators and/or display drug

trafficking methods, narcotics, firearms, or money and proceeds from

narcotics transactions.

i. All records, documents, and materials showing control, possession, custody,

dominion or other indicia of occupancy over physical premises, including but

not limited to: personal mail, checkbooks, personal identification, personal

effects, notes, other correspondence, utility and other bills, internet service

provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys.

j.  Any and all electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking.

k.  Firearms and ammunition;

l.  Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

m.  Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

n.  Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

o.  Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

p.  United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

q. Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

IN THE MATTER OF THE SEARCH OF:
16 HALLWOOD AVENUE,
DAYTON, OHIO 45417

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Eric J. McIntosh, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the premises known as 16 Hallwood Avenue,

Dayton, Ohio 45417, hereinafter "**TARGET RESIDENCE**," further described in Attachment A,

for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been since August of 2003. My primary duties as a Special Agent consist of investigating criminal

enterprises, narcotics investigations, organized crime, and violent crimes to include unlawful

possession and possession with the intent to distribute of controlled substances, as well as the

associated conspiracies in violation of Title 21, United States Code, Sections 841, 843 and 846. I

am familiar with federal firearms laws, and investigations into possession of a firearm by a

convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the associated

violations of Title 18, United States Code, Sections 922 and 924. As part of my standard training

to become a Special Agent with the FBI, I have received specialized training in the means and

methods by which individuals and drug trafficking organizations conduct their illegal drug

trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking organizations. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. I have received further specialized training concerning the interception of wire communications.

3.     I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers and violent criminal enterprises. I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, and the use of pen registers, including pen registers in the form of digital analyzers.

4.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### A. Overview of the Investigation

5.     The United States, including the FBI, is conducting a criminal investigation of Dlaquan CANTRELL ("CANTRELL") and other co-conspirators, both known and unknown, regarding possible violations of possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances, in violation of Title 21, U.S.C., §§ 841(a)(1) and 846 (collectively referred to as the "Subject

2

Offenses"). Specifically, the FBI Cincinnati and the Warren County Drug Task Force ("WCDTF") are investigating a Dayton area, poly-drug distribution network led by CANTRELL.

6. As described in more detail below, agents have conducted physical and electronic surveillance of CANTRELL, and have conducted multiple controlled purchases of drugs from CANTRELL. The evidence gathered from my investigation suggests that CANTRELL uses the **TARGET RESIDENCE** in furtherance of his drug trafficking activities.

**B. Law enforcement learned that CANTRELL traffics drugs in the Dayton, OH area.**

7. From August 2022 to the present, agents and officers obtained information from a Confidential Informant ("CI")[1] with direct knowledge of CANTRELL's drug trafficking organization. The CI positively identified CANTRELL as a Dayton-based methamphetamine and fentanyl supplier.

8. The CI told law enforcement that CANTRELL is currently selling drugs in and around the Dayton, OH area. The CI told law enforcement that CANTRELL uses the cellular telephone number (937) 672-0827.

**C. In the past two months, CANTRELL sold drugs to an undercover agent on four separate occasions.**

    **i.   CANTRELL sold drugs to an undercover agent on September 8, 2022.**

9. On September 8, 2022, a law enforcement officer, acting in an undercover capacity (hereinafter, "UC") purchased six ounces of methamphetamine and a half ounce of cocaine from CANTRELL for $1,700 in the parking lot of Kohl's department store, located at 10800 Innovation Drive, Miamisburg, Ohio. The UC arranged the drug transaction by contacting CANTRELL at

---

[1] The Confidential Informant has provided information to officers that has proven to be reliable and truthful. The CI is cooperating with law enforcement due to a pending criminal investigation into possible violations of state of Ohio drug laws. Although no promises have been made to the CI, the CI is motivated to cooperate with law enforcement in hopes of consideration during the prosecution of his/her criminal case. The CI has never provided materially false information.

3

cellular telephone number (937) 672-0827 in recorded text messages. An excerpt from their text message exchange is below:

| | |
|---|---|
| UC | You on with that fire and ice |
| CANTRELL | I got it brother. |
| UC | Ticket on zip of [emoji of fire]? |
| CANTRELL | To you 200. |
| UC | Girl? |
| CANTRELL | My bad brother. |
| CANTRELL | [Crying smiley face emoji] |
| CANTRELL | I got everything you need brother. |

10.    In my training and experience, "fire" and/or an emoji of fire refers to heroin or fentanyl, and "ice" refers to methamphetamine. "Ticket" is a common slang term for price, and "zip" is a common street term for an ounce of narcotics. Two hundred dollars per ounce is a price consistent with methamphetamine, not cocaine, which is much more expensive. The UC clarified what drug CANTRELL was quoting him by asking "Girl?", a common slang word for cocaine. CANTRELL replied, "My bad brother," because CANTRELL had provided the UC a price per ounce of methamphetamine, not a price for cocaine ("girl").

11.    After the text exchange described above, CANTRELL, using cellular telephone number (937) 672-0827, placed a Facetime video call[2] to the UC which was audio recorded. During the video call, CANTRELL opened a shoebox and showed the UC a large amount of drugs and U.S. currency. CANTRELL told the UC they were "like family now." CANTRELL proceeded to walk around his house showing the UC the inside of his home, to include his

---

[2] The UC compared the person on the Facetime video call with the Ohio driver's license photograph of CANTRELL and determined them to be one and the same.

4

girlfriend[3] sleeping in a bed in a bedroom. The UC and CANTRELL then discussed the UC purchasing from CANTRELL six ounces of methamphetamine for $1,000 and a half ounce of cocaine for $700 at the Kohl's parking lot located at 10800 Innovation Drive, Miamisburg, Ohio.

12.    On September 8, 2022, at approximately 12:08 p.m., CANTRELL, using cellular telephone number (937) 672-0827, placed a Facetime video call to the UC and asked the UC what the UC was driving. The UC and surveillance agents then observed an unknown black male walking in the parking lot directly towards the UC's vehicle. Surveillance agents also observed CANTRELL, who arrived in his tan 2013 Nissan Altima bearing Ohio license plate number JTZ6052 (the "Nissan Altima"), outside of the Kohl's department store in a separate area from the unknown black male. Observing the unknown male approaching the UC's vehicle, the UC moved to another area of the parking lot. The UC noted during the Facetime video call that CANTRELL asked the UC why the UC was moving despite CANTRELL not being in a position to see the UC. In my training and experience, drug traffickers use associates to conduct countersurveillance of drug deals to detect a law enforcement presence. The unknown black male walking towards the UC's vehicle and CANTRELL knowing the UC was moving his vehicle while remaining out of sight is consistent with CANTRELL using an associate to conduct countersurveillance prior to the drug transaction.

13.    At approximately 12:10 p.m., while on another Facetime video call with the UC using cellular telephone number (937) 672-0827, CANTRELL walked out of Kohl's and got in the UC's vehicle.[4] CANTRELL pulled methamphetamine (total package weight of 169.9 grams)

---

[3] The woman CANTRELL identified as his girlfriend appeared to be D.S., who, as I describe in more detail below, agents have observed with CANTRELL on multiple occasions. The **TARGET RESIDENCE's** utilities are in D.S.'s name. Because D.S. is not currently the target of a criminal investigation, I am using her initials to protect her privacy.

[4] Agents obtained Kohl's security video which shows CANTRELL walking in and out of the department store.

and cocaine (total package weight of 15.3 grams) from his pant pocket and placed the drugs in a Taco Bell bag the UC had in the vehicle. The UC pulled the methamphetamine and cocaine out of the Taco Bell bag and asked CANTRELL if the weight was going to be right. CANTRELL advised it would be right and the UC handed CANTRELL $1,700 in pre-recorded buy money. CANTRELL then exited the UC's vehicle and walked back inside Kohl's. After a short period of time, surveillance agents saw CANTRELL and a woman, D.S.,[5] walk out of Kohl's and get into the Nissan Altima. Agents noted CANTRELL was carrying a baby carrier. CANTRELL drove the Nissan Altima away.

### ii.   CANTRELL sold drugs to an undercover agent on September 22, 2022.

14.   On September 22, 2022, the UC purchased three and a quarter ounce of methamphetamine and an ounce of fentanyl from CANTRELL for $1,900 in the parking lot of Applebee's, located at 105 North Springboro Pike, Dayton, Ohio. The UC arranged the drug transaction by contacting cellular telephone number (937) 672-0827, used by CANTRELL, in recorded text messages. The UC asked CANTRELL, "You on," and CANTRELL responded, "Yes was checking on you." CANTRELL, using cellular telephone number (937) 672-0827, then placed a Facetime video call[6] to the UC. During the video call, the UC and CANTRELL arranged the purchase of one ounce of fentanyl for $1,400 and four ounces of methamphetamine for $600 for a total purchase price of $2,000. CANTRELL told the UC to meet him at a restaurant near the Dayton Mall at 5:30 p.m.

---

[5] D.S. is the registered owner of the Nissan Altima. Surveillance agents compared the woman observed during the September 8, 2022, surveillance with the Ohio driver's license photograph of D.S. and determined them to be one and the same. Because D.S. is not currently the target of a criminal investigation, I am using her initials to protect her privacy.
[6] The Facetime video call was not recorded by the UC because a recording device was not available at the time.

15.     On September 22, 2022, at approximately 5:15 p.m., agents and officers established surveillance near the Dayton Mall. As the UC was driving to the area, CANTRELL, using cellular telephone number (937) 672-0827, placed several Facetime video calls[7] to the UC repeatedly asking where the UC was at. In my training and experience, drug dealers will place repeated calls to an individual they are selling drugs to in an effort to detect if law enforcement surveillance is involved. The repeated calls make it difficult for a UC or a CI to coordinate with law enforcement officers conducting surveillance of the drug transaction. During one of the Facetime video calls, CANTRELL directed the UC to the Applebee's restaurant, located at 105 North Springboro Pike, Dayton, Ohio.

16.     Surveillance agents observed CANTRELL (driver) and an unidentified female (passenger)[8] in the Nissan Altima, which was parked in the Applebee's parking lot. The UC parked the UC's vehicle next to the Nissan Altima. CANTRELL got out of the Nissan Altima and into the UC's vehicle. CANTRELL pulled out a sock and laid it on the center console of the UC's vehicle. The UC pulled plastic baggies containing methamphetamine (total package weight of 91.2 grams) and fentanyl[9] (total package weight of 29.0 grams) out of the sock, examined it, placed the drugs back in the sock and placed the sock in a cup in the UC vehicle. CANTRELL told the UC the methamphetamine would be "a little light" so the UC could take $100 off the agreed-upon purchase price of $2,000. The UC handed CANTRELL $1,900 in pre-recorded buy money. CANTRELL then exited the UC's vehicle and got back into the driver's seat of the Nissan Altima. Agents and officers then surveilled CANTRELL and the unidentified female as they traveled to the Dayton Mall, parked, and entered the mall.

---

[7] The Facetime video calls were audio recorded.
[8] The woman's physical characteristics appeared to be consistent with those of D.S., the woman the agents observed with CANTRELL during the September 8, 2022, transaction.
[9] The fentanyl supplied by CANTRELL was dyed purple in color.

7

17. Shortly after the transaction on September 22, 2022, CANTRELL, cellular telephone number (937) 672-0827, placed a Facetime video call[10] to the UC. CANTRELL told the UC to drive carefully. The UC then asked CANTRELL if the UC could "step on this," referring to cutting the fentanyl. CANTRELL told the UC the UC could "hit it one time again," meaning the UC could add cutting agent to the fentanyl. CANTRELL explained the fentanyl was very strong. CANTRELL advised the UC to have a drug user with a high tolerance test the fentanyl to tell the UC how strong the fentanyl really is.

18. On September 23, 2022, at approximately 7:45 a.m., agents and officers conducted a spot check surveillance of the **TARGET RESIDENCE**. Agents observed the Nissan Altima and a grey Jeep Cherokee (the "Jeep Cherokee"), bearing California license plates associated with a rental car company, parked at the rear of the **TARGET RESIDENCE**.

    **iii.    CANTRELL sold drugs to an undercover agent on October 4, 2022.**

19. October 3, 2022, at approximately 6:55 a.m., agents and officers conducted a spot check surveillance of the **TARGET RESIDENCE**. Agents observed the Nissan Altima and the Jeep Cherokee parked at the rear of the **TARGET RESIDENCE**. At approximately 12:00 p.m., agents and officers established surveillance near the **TARGET RESIDENCE**. Agents observed CANTRELL, D.S., and several young children coming and going from the rear of the house.

20. The next day, on October 4, 2022, the UC purchased six ounces of methamphetamine and an ounce of fentanyl from CANTRELL for $2,200 in the parking lot of Applebee's, located at 105 North Springboro Pike, Dayton, Ohio. The UC arranged the drug transaction by contacting cellular telephone number (937) 672-0827, used by CANTRELL, in recorded text messages. An excerpt from their text message exchange is below:

---

[10] The Facetime video call was audio recorded.

8

| UC | What is good |
|---|---|
| **CANTRELL** | Wats up brother jayy |
| UC | Shit you on |
| **CANTRELL** | Rob deal plus one slow? |

21.     CANTRELL, using cellular telephone number (937) 672-0827, then placed a Facetime video call[11] to the UC. During the video call, the UC and CANTRELL arranged the purchase of six ounces of methamphetamine for $1,000 and one ounce of fentanyl for $1,200 for a total purchase price of $2,200.  CANTRELL noted he was taking $200 off the purchase price for the UC traveling to the area of the Dayton Mall.

22.     On October 4, 2022, at approximately 1:00 p.m., agents and officers established surveillance in the area of the **TARGET RESIDENCE** and near the Dayton Mall.  Agents noted the Nissan Altima was parked at the **TARGET RESIDENCE**. At approximately 1:50 p.m., agents observed CANTRELL arrive at the **TARGET RESIDENCE** in a black Toyota Highlander, bearing an Indiana temporary license plate registered to a rental car company (the "Toyota Highlander"). Agents noted CANTRELL retrieved garbage cans from the alley and brought them to the rear of the house.  Agents further noted CANTRELL appeared to remove keys from his pants pocket which he used to open a rear door to the **TARGET RESIDENCE**.  Based on my training and experience, the behaviors agents observed suggest that CANTRELL is using the **TARGET RESIDENCE** as his primary residence.

23.     At approximately 2:16 p.m., agents observed CANTRELL and D.S. exit the back of the **TARGET RESIDENCE**, get into the Toyota Highlander, and depart the area.  I photographed CANTRELL as he walked out of the **TARGET RESIDENCE** to capture what

---

[11]  The Facetime video call was not recorded by the UC because a recording device was not available at the time.

appeared to be a bulky object in his right front pants pocket. Based on my training and experience, I know that drug traffickers transport drugs hidden in their clothing, and that the size of the object in CANTRELL's pocket is consistent with the quantities of drugs CANTRELL is known to traffic. Shortly after leaving the area of the **TARGET RESIDENCE**, surveillance agents ended surveillance of CANTRELL for fear of CANTRELL detecting their presence. At approximately 2:10 p.m., CANTRELL, using cellular telephone number (937) 672-0827, placed a Facetime video call[12] to the UC and asked the UC where the UC was at. At approximately 2:22 p.m., CANTRELL, using cellular telephone number (937) 672-0827, placed a Facetime video call[13] to the UC and offered to take another $200 off the purchase price for the narcotics if the UC would travel closer to CANTRELL, which the UC refused. The UC noted, despite surveillance agents observing CANTRELL leave his residence, during the Facetime video call, CANTRELL was inside a house and showed the UC methamphetamine and drugs that were consistent in appearance with fentanyl. The UC observed a lot of lottery tickets on a countertop in the background and asked CANTRELL if he was going to win the lottery and CANTRELL stated, "I hope so, so I can get outta of the game." Based on my training and experience, I know that "the game" is a slang term for the drug trafficking business.

24.    During one of the Facetime video calls leading up to the October 4, 2022, transaction, CANTRELL directed the UC to the same Applebee's restaurant[14] where the UC and CANTRELL met for the September 22, 2022, drug deal. CANTRELL told the UC to stay on a video call until they met. In my training and experience, drug dealers will stay on a telephone or video call with an individual they are selling drugs to in an effort to detect if law enforcement

---

[12] The Facetime video call was audio recorded.
[13] The Facetime video call was audio recorded.
[14] As noted in a previous section above, the Applebee's restaurant is located at 105 North Springboro Pike, Dayton, Ohio

surveillance is involved. By staying on the call, the dealer makes it difficult for a UC or a CI to coordinate with law enforcement officers conducting surveillance of the drug transaction.

25.     The UC parked the UC vehicle in the Applebee's parking lot. The UC and surveillance agents observed CANTRELL (driver) and D.S. (passenger), in the Toyota Highlander, park beside the UC's vehicle. CANTRELL got out of the Toyota Highlander and walked to the driver's side door of the UC's vehicle. CANTRELL handed the UC a plastic Kroger bag which contained baggies containing methamphetamine (total package weight of 173.1 grams) and fentanyl[15] (total package weight of 33.8 grams). The UC noted CANTRELL appeared to be extremely nervous. CANTRELL started to walk away but the UC told CANTRELL the UC wanted to look at the quality of the drugs. The UC opened the Kroger bag and examined the drugs. CANTRELL again started to walk away and the UC asked CANTRELL if he wanted to get paid. CANTRELL then returned to the UC's vehicle and the UC handed CANTRELL $2,200 of pre-recorded buy money. CANTRELL then returned to the Toyota Highlander, got into the driver's seat and departed the area, not followed by surveillance. The UC noted CANTRELL still had the UC on an active Facetime live video call as CANTRELL pulled away and CANTRELL told the UC to be careful. The UC asked CANTRELL if the weight was going to be right and CANTRELL stated the weight would be over (meaning the UC received the quantity the UC had requested).

26.     CANTRELL, using cellular telephone number (937) 672-0827, has frequently communicated with the UC. For example, CANTRELL, using cellular telephone number (937) 672-0827, placed Facetime video calls to the UC on September 30, 2022, and again on October 2, 2022. During both Facetime calls CANTRELL offered to sell the UC controlled substances, such as methamphetamine and fentanyl. During an October 16, 2022, Facetime video call, CANTRELL

---

[15] The fentanyl supplied by CANTRELL was dyed purple in color.

11

asked the UC about purchasing "girl," (cocaine) and "the Fetty" (fentanyl). CANTRELL told the UC, "You have not got any girl from me since the first time and you only bought it from me one time." The UC told CANTRELL the UC would get with him the next week.

> **iv.** **CANTRELL sold drugs to an undercover agent on October 20, 2022.**

27.     On October 20, 2022, the UC purchased one ounce of fentanyl and three and a half grams of cocaine from CANTRELL for $1,400 in the parking lot of the Kohl's department store located at 10800 Innovation Drive, Miamisburg, Ohio. The UC arranged the drug transaction by contacting CANTRELL's cell phone, cell phone number (937) 672-0827, in recorded text messages. An excerpt from their text message exchange is below:

| | |
|---|---|
| **CANTRELL** | Brother it's bad on the ice jay. My people said couple days for that. Wat you want to do brother |
| **UC** | I got 16 ready. What can you do me for. |

28.     I know, based on my training and experience, that "ice" is a common slang term for methamphetamine. Based on context, I believe that, in the above text exchange, CANTRELL was telling the UC that CANTRELL did not have methamphetamine and that it would take several days until CANTRELL's supplier(s) would be able to give CANTRELL more methamphetamine to sell.

29.     Following this text message exchange, CANTRELL, using cellular telephone number (937) 672-0827, placed a Facetime video call[16] to the UC. During the video call, the UC and CANTRELL arranged the purchase of one ounce of fentanyl and three and a half grams of cocaine for a total purchase price of $1,400.

---

[16] The Facetime video call was not recorded by the UC because a recording device was not available at the time.

30.    On October 20, 2022, at approximately 8:00 a.m., agents and officers established surveillance in the area of the **TARGET RESIDENCE** and near the Kohl's department store. Agents noted the Nissan Altima and a black Ford Fusion, bearing an Ohio license plate registered to D.S, parked at the **TARGET RESIDENCE**. At approximately 8:16 a.m., agents observed CANTRELL arrive at the **TARGET RESIDENCE** in a newer-model silver Chevrolet Blazer, bearing a California license plate registered to a rental car company (the "Chevrolet Blazer"). Agents noted CANTRELL appeared to remove keys from his pants pocket which he used to open a rear door to the **TARGET RESIDENCE**.

31.    At approximately 8:44 a.m., agents observed CANTRELL exit the back of the **TARGET RESIDENCE**, get into the Chevrolet Blazer, and depart the area. Shortly after leaving the area of the **TARGET RESIDENCE,** surveillance agents lost sight of CANTRELL. At approximately 9:31 a.m., CANTRELL, using cellular telephone number (937) 672-0827, placed a Facetime video call[17] to the UC and asked the UC where the UC was at.

32.    The UC and surveillance agents observed CANTRELL, driving the Chevrolet Blazer, back into a parking spot in the lot. The UC, as directed by CANTRELL, then parked next to CANTRELL. CANTRELL got out of the Chevrolet Blazer and walked to the driver's side door of the UC's vehicle. CANTRELL handed the UC a plastic bag which contained baggies containing fentanyl[18] (total package weight of 29.3 grams) and cocaine (total package weight of 4.0 grams). The UC handed CANTRELL $1,400 of pre-recorded buy money and CANTRELL turned to return to the Chevrolet Blazer. The UC noted CANTRELL appeared to be extremely nervous. The UC asked CANTRELL if they were going to talk, and CANTRELL told the UC to call him. CANTRELL still had the UC on an active Facetime video call as CANTRELL and the UC each

---

[17] The Facetime video call was audio recorded.
[18] The fentanyl supplied by CANTRELL was dyed pink in color.

departed the area of the deal. CANTRELL and the UC briefly discussed another possible drug deal in the near future.

**D. The evidence suggests that CANTRELL resides at the TARGET RESIDENCE and uses the TARGET RESIDENCE to store his drugs, drug proceeds, and drug trafficking paraphernalia.**

33.     As I describe in detail above, the UC purchased drugs from CANTRELL on four separate occasions, as summarized in the below chart:

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

| Date | Drugs Purchased & Price | Lab Results[19] | Location | Vehicle used by CANTRELL |
|------|------|------|------|------|
| September 8, 2022 | Six ounces methamphetamine and a half ounce of cocaine for $1,700 | • 167.4 grams of methamphetamine (Schedule II) <br> • 13.474 grams cocaine (Schedule II) | Kohl's parking lot in Miamisburg, OH | Nissan Altima |
| September 22, 2022 | Three and a quarter ounces of methamphetamine and an ounce of fentanyl for $1,900 | • 89.141 grams methamphetamine (Schedule II) <br> • 27.830 grams of a substance and mixture containing a detectable amount of fentanyl (Schedule II) and fluorofentanyl (Schedule I), a fentanyl analogue[20] | Applebee's parking lot in Dayton, OH | Nissan Altima |
| October 4, 2022 | Six ounces of methamphetamine and an ounce of fentanyl for $2,200 | • 28.214 grams of a substance and mixture containing a detectable amount of fentanyl (Schedule II) and fluorofentanyl (Schedule I), a fentanyl analogue[21] <br> • 166.638 grams of methamphetamine (Schedule II) | Applebee's parking lot in Dayton, OH | Toyota Highlander (rental vehicle) |
| October 20, 2022 | One ounce of fentanyl and three and a half grams of cocaine for $1,400 | Pending | Kohl's parking lot in Miamisburg, OH | Chevrolet Blazer (rental vehicle) |

34.     In addition to the above four controlled purchases, CANTRELL and the UC

continue to communicate regarding potential future purchases. On October 26, 2022, CANTRELL

---

[19] The Hamilton County Crime Laboratory provided analysis of the purchased substances. The listed amounts have margins of error ranging from +/- 0.005 grams to +/- 0.5 grams.
[20] In addition to fentanyl and fentanyl analogue, the substance also contained a detectable amount of metonitazene.
[21] In addition to fentanyl and fentanyl analogue, the substance also contained detectable amounts of cocaine, methamphetamine, and other controlled and uncontrolled substances.

communicated with the UC about potentially arranging another fentanyl purchase. This leads me to believe that CANTRELL currently has fentanyl in his possession.

35. From approximately October 4, 2022, to the present, agents began receiving court-authorized cell site location data for the cellular telephone assigned telephone number (937) 672-0827, known by agents to be used by CANTRELL. The cell site location data shows that CANTRELL resides overnight at the **TARGET RESIDENCE**. The cell site location data also shows that CANTRELL travels throughout the day, frequently making stops at various locations throughout the Dayton area. Analysis of the cell site location data suggests that CANTRELL does not have any legitimate employment.[22] The cell site location data shows that CANTRELL does not frequent any storage facilities, which suggests that CANTRELL stores his drugs, drug trafficking paraphernalia, and drug proceeds at the **TARGET RESIDENCE**.

36. The information gathered during my investigation has consistently indicated that CANTRELL lives at the **TARGET RESIDENCE** and stores his drugs there. As I describe in more detail above, prior to the first buy on September 8, 2022, CANTRELL gave the UC a video tour of CANTRELL's house over FaceTime. During this call, CANTRELL identified the house as his residence, and showed the UC drugs he kept inside the house. The interior of this house appeared to be consistent with the size of the **TARGET RESIDENCE**. The agents' physical surveillance of CANTRELL at the **TARGET RESIDENCE** immediately prior to the drug transactions on October 4, 2022, and October 20, 2022, is also consistent with CANTRELL using the **TARGET RESIDENCE** in furtherance of his drug trafficking activities; immediately prior to

---

[22] The cell site location data does not show CANTRELL traveling regularly to any place of employment or keeping consistent hours. Based on my training and experience, the cell site location data is consistent with CANTRELL being a full-time drug trafficker.

these drug transactions, agents observed CANTRELL depart the **TARGET RESIDENCE** in rental vehicles to sell the UC drugs.

37.     As noted above, agents have observed CANTRELL drive several different vehicles to his meetings with the UC and have observed those vehicles and others parked in **TARGET RESIDENCE's** driveway. Some of these vehicles are rental vehicles. Since the last controlled buy on October 20, 2022, agents observed an additional rental vehicle parked at the **TARGET RESIDENCE**. Based on my training and experience, I know that drug traffickers often use rental cars and change cars frequently to conduct drug transactions in an effort to prevent law enforcement from determining their true identity.  Therefore, I believe that CANTRELL's use of multiple vehicles, some of which are rental vehicles, is consistent with drug trafficking activity.

38.     CANTRELL's criminal history involves multiple felony arrests and convictions. On or about November 5, 2003, CANTRELL was convicted by the state of Ohio of felony tampering with evidence and possession of drugs and sentenced to two years' confinement.  Based on my review of CANTRELL's criminal history, it also appears that on or about December 15, 2017, CANTRELL was convicted by the state of Ohio of possessing cocaine.   On or about December 19, 2017, in what appears to be a separate criminal conviction, CANTRELL was convicted by the state of Ohio of felony possession of drugs and sentenced to three years and ten months' confinement.

39.     I believe, for all the reasons I give above, as well as the additional reasons I give below, that CANTRELL is using the **TARGET RESIDENCE** to further his drug trafficking activities, and that evidence of his drug trafficking activities will be found inside the **TARGET RESIDENCE** and any vehicles located at the **TARGET RESIDENCE**.

40.     Based upon my training and experience, my participation in this investigation, and other drug trafficking investigations, I have reason to believe that:

a.  drug traffickers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

b.  drug traffickers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies; even though these assets are placed in the names of other persons or entities, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.  drug traffickers must maintain and/or have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business;

d.  drug traffickers often maintain money counting machines, money wrappers and rubber bands, boxes, bags, brief cases, suitcases, or containers used to carry drug proceeds and/or controlled substances;

e.  drug traffickers often maintain in their residences and/or business establishments records relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed including some or all of the following written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers (i.e. bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt,

18

concealment, transfer, or movement of money generated from the illegal sale of drugs);

f.  drug traffickers commonly use cellular phones to communicate with other members of the drug trafficking organization (DTO), narcotics source of supply(s), and/or narcotics customers in furtherance of violations of the Uniform Controlled Substances Act;

g.  drug traffickers commonly provide illegal narcotics to their organization on consignment sale to their customers, who subsequently pay for the drugs after reselling said drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences and/or their businesses for their ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h.  drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

i.  drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts), and evidence of this includes documents like stock certificates, bonds, deposit certificates, and travelers checks;

19

j.  drug traffickers often have photographs or video movies of themselves, their co-conspirators, and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers possession, their residence and/or their place of business;

k.  drug traffickers' methods of transporting drugs include but are not limited to: commercial airlines, private motor vehicles, and government and contract mail carriers. I know that the vehicles, residences, or business locations of drug traffickers will often contain records of drug-related travel. These records may include airline ticket receipts, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations rental car receipts and luggage tags reflecting points of travel;

l.  drug traffickers commonly have firearms in their possession (on their person, at their residence, and/or their business) including but not limited to handguns, rifles, shotguns and automatic weapons. These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property or manufacturing operation;

m.  it is common for drug traffickers to secrete in vehicles they use the items identified in the above paragraphs;

n.  drug traffickers will often accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

20

o. drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "safe houses" where the traffickers may stay for periods of time; I know that these residences which may be occupied by other conspirators or associates may contain elements of the traffickers drug crimes to include all items noted above;

p. drug traffickers commonly have evidence of purchases of goods used in the manufacture of controlled substances secreted in their residences, businesses, or vehicles; and

q. drug traffickers commonly secret in their residences and/or places of business, over a period of years, items such as those identified in the above paragraphs.

41.     In sum, I know, based on my training and experience, that large-scale drug traffickers frequently use residences for the purpose of storing illegal drugs, records of drug transactions, large amounts of financial instruments including currency, jewelry, precious metals, and other items purchased with drug proceeds; and that such residences often contain evidence of co-conspirator activity, and financial transactions related to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal drug trafficking activities. I therefore believe CANTRELL is currently using the **TARGET RESIDENCE** as described throughout this affidavit, to conceal evidence of day-to-day selling of narcotics, and that evidence of drug trafficking as I described above—such as drug ledgers, firearms and ammunition, drug-related manufacturing equipment and paraphernalia, and financial instruments such as cash—are likely to be found at the **TARGET RESIDENCE**.

## TECHNICAL TERMS

42.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.  Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

43.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the **TARGET RESIDENCE** (hereinafter "PREMISES"), in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

44.     *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a

22

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

45. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

23

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and

24

malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or

25

consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

46.  *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.

However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

47.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

48.     Because several people may share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

49.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

50.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and

28

search warrant. I believe that sealing this document is necessary because the items and information

to be seized are relevant to an ongoing investigation into the criminal organizations as not all of

the targets of this investigation will be searched at this time. Based upon my training and

experience, I have learned that online criminals actively search for criminal affidavits and search

warrants via the Internet, and disseminate them to other online criminals as they deem appropriate,

i.e., post them publicly online through the carding forums. Premature disclosure of the contents

of this affidavit and related documents may have a significant and negative impact on the

continuing investigation and may severely jeopardize its effectiveness.


Respectfully submitted,


Eric J. McIntosh
Special Agent
Federal Bureau of Investigation



Subscribed and sworn to before me via reliable electronic means on October 26th, 2022


PETER B. SILVAIN, JR.
UNITED STATES MAGISTRATE JUDGE

29

## ATTACHMENT A

*Property to Be Searched*

The property to be searched is 16 Hallwood Avenue, Dayton, Ohio 45417 (**TARGET RESIDENCE**), pictured below, and further described as a single-family residence with white siding, blue shutters, and grey roof shingles. An address number of "16" in black numbers is affixed to the house to the right of the front covered porch. The front door has a white-trimmed storm door. The property to be searched also includes the tan 2013 Nissan Altima bearing Ohio license plate number JTZ6052, pictured below, and any vehicles located on the premises or on the curtilage of the premises during the execution of the search warrant.







## ATTACHMENT B

*Items to be Seized*

All items and records relating to violations of Title 21 U.S.C. §§ 841 and 846, those violations involving Dlaquan CANTRELL and occurring in or after September 1, 2022, including:

a. Any and all controlled substances (as defined under Title 21, United States Code, § 812), including, but not limited to, methamphetamine, cocaine, and fentanyl;

b. Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

c. Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports

(such as shipper's export declarations, bills of lading, invoices, tax
identification number paperwork, and other similar documents).

d. Currency (whether U.S. or foreign) and financial instruments, including
travelers checks, bonds, stock certificates, cashier's checks, certificates of
deposit, and money orders, derived from the sale of controlled substances in
violation of Title 21, United States Code, § 841 and money wrappers, rubber
bands, money containers, and money counting machines.

e. Precious metals, jewelry or other high-value items that could be obtained with
the proceeds of the sales of controlled substances.

f. Any and all records, documents and deeds reflecting the purchase or lease of
real estate, vehicles, precious metals, jewelry or other high-value items that
could be obtained with the proceeds of the sales of controlled substances.

g. Any boxes, bags, briefcases, suitcases, containers, or other items that could be
used to mail, carry, import, export, smuggle, or transport marijuana or any
other controlled substances.

h. Photographs (both paper and digital form) and video and audio recordings
which document an association with other co-conspirators and/or display drug
trafficking methods, narcotics, firearms, or money and proceeds from
narcotics transactions.

i. All records, documents, and materials showing control, possession, custody,
dominion or other indicia of occupancy over physical premises, including but
not limited to: personal mail, checkbooks, personal identification, personal
effects, notes, other correspondence, utility and other bills, internet service

provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys.

j. Any and all electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking.

k. Firearms and ammunition;

l. Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

m. Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

n. Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

o. Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

p. United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

      q. Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

    2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c. evidence of the lack of such malicious software;

      d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.